HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)*
mcolumbo@dhillonlaw.com
JEREMIAH D. GRAHAM (SBN: 313206)
jgraham@dhillonlaw.com
ANTHONY J. FUSARO, JR. (SBN: 345017)*
afusaro@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
*Counsel of Record for Plaintiff Republican National Committee*

THOMAS R. MCCARTHY**
tom@consovoymccarthy.com
THOMAS S. VASELIOU**
tvaseliou@consovoymccarthy.com
CONOR D. WOODFIN**
conor@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*

*Admission to the Eastern District forthcoming
**Admission *Pro Hac Vice* forthcoming

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>                    Plaintiff,<br> v.<br><br>GOOGLE INC.<br><br>                    Defendant. | Case Number:<br><br><br>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES |

**INTRODUCTION**

1.      This case is about a market-dominant communications firm unlawfully discriminating against the Republican National Committee ("RNC") by throttling its email messages because of the RNC's political affiliation and views. Email is an indispensable means of communication to send important information and to build communities. The RNC also relies on this crucial conduit as it engages in its core mission of conducting political activity in support of the Republican Party. This includes communicating political messaging and important Get-Out-The-Vote information to supporters, as well as maintaining relationships with individuals who have and will continue to financially support the RNC, so that the RNC can fund its political activities. To effectively reach and grow its community, the RNC takes great pains to ensure that every email it sends is to someone who requested it.

2.      Nevertheless, Google has relegated millions of RNC emails *en masse* to potential donors' and supporters' spam folders during pivotal points in election fundraising and community building. The timing of Google's most egregious filtering is particularly damning. For most of each month, nearly all of the RNC's emails make it into users' inboxes. At approximately the same time at the end of each month, Google sends to spam *nearly all* of the RNC's emails. Critically, and suspiciously, this end of the month period is historically when the RNC's fundraising is most successful. It doesn't matter whether the email is about donating, voting, or community outreach. And it doesn't matter whether the emails are sent to people who requested them. This discrimination has been ongoing for about ten months—despite the RNC's best efforts to work with Google.

3.      Throughout 2022, the RNC has engaged with Google month after month to obtain an explanation and a solution. But every explanation has been refuted and every solution has failed. Google continues to suppress the RNC's emails, and now Google has fallen silent, refusing to discuss the issue further. The only reasonable inference is that Google is intentionally sending critical RNC emails to the spam folder because it's the RNC sending them. Google's discrimination has already caused the RNC to lose valuable revenue in California and the rest of the country, and Google's conduct will continue to cost the RNC further revenue in the coming weeks as the 2022 midterm election looms, and beyond. Perhaps worse, Google's conduct has caused the RNC to lose its ability



Verified Complaint                                                                                           Case No.

to communicate voting information and other political messaging to its supporters during the critical midterm elections. This harm is irreparable and must be stopped.

4.      Unfortunately, this is not the first time a communications company has discriminated against people based on their political views and affiliation, but fortunately this means there are laws ready to combat this harm. In the 1800s, a pivotal form of communication was the telegraph and Western Union had a dominate market share across the country. By the late 1800s, "legislators grew 'concern[ed] about the possibility that the private entities that controlled this amazing new technology would use that power to manipulate the flow of information to the public when doing so served their economic or political self-interest.'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 470 (5th Cir. 2022) (opinion of Oldham, J.) (quoting Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299, 2321 (2021)).

5.      "These fears proved well-founded." *NetChoice*, 49 F.4th at 470. Even though Western Union offered to serve any member of the public, it repeatedly discriminated against messages based on the message's political views or on the person's political affiliation. It, for example, "discriminated against certain political speech, like strike-related telegraphs." *Id.*; *see also* Lakier, *supra*, at 2322. It was also "widely believed that Western Union … 'influenc[ed] the reporting of political elections in an effort to promote the election of candidates their directors favored.'" *NetChoice*, 49 F.4th at 470 (quoting Lakier, *supra*, at 2322); *see also* The Blaine Men Bluffing, N.Y. Times, Nov. 6, 1884, at 5. And it was not the only time Western Union was accused of discriminating based on political views or affiliation: "Similar accusations were made about Western Union's role in the presidential contest[] eight years earlier." Lakier, *supra*, at 2322 n.114 (citing David Hochfelder, The Telegraph in America, 1832-1920, at 176 (2013)).

6.      In response to these discriminatory practices, states across the country enacted nondiscrimination laws that prohibited businesses from "manipulating the flow of information to the public." Lakier, *supra*, at 2322; *see also NetChoice*, 49 F.4th at 471. One such state was California. It passed laws requiring "common carriers" to timely transmit messages in a nondiscriminatory manner. *See* Cal. Civil Code §2168 *et seq.*

7.      States took other measures to ban businesses from discriminating against the public.



Verified Complaint                                                                                    Case No.

States, for example, passed civil rights acts (also called public-accommodation provisions) barring businesses from discriminating based on certain classes, including political affiliation and beliefs. *See, e.g.*, Eugene Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022). California again is one such state. *See* Cal. Civ. Code §§51, 51.5; *see also, e.g.*, *Marina Point, Ltd. v. Wolfson*, 640 P.2d 115, 117 (Cal. 1982) ("political affiliation"); *In re Cox*, 474 P.2d 992, 1000 (Cal. 1970) ("members of the John Birch Society, or who belong to the American Civil Liberties Union").

8.      Despite these efforts by states (and the federal government), history has regrettably repeated itself. Once again, a dominant communications company is discriminating based on political affiliation and unlawfully controlling the flow of information to the public. At bottom, Google's email service is a modern-day Western Union: Google offers to carry messages in the form of electronic mail. Google allows any adult to make a Gmail account and transmit and receive communications after agreeing to the same boilerplate terms of service. Google possesses a significant market share of the email industry with at least 53% of Americans having Gmail accounts. Google's email service is an indispensable form of communication for the public to access information and to achieve vocational success. And Americans expect that when they send an email to someone who has requested it, the email will be reasonably sent and delivered in the recipient's inbox.

9.      Although Google's tools for discriminating might be more sophisticated than Western Union's, that doesn't make it any less of a business in violation of the longstanding nondiscrimination obligations states like California have enacted. Indeed, nondiscrimination provisions have repeatedly been applied to technology more sophisticated than the telegraph. They've applied to the telephone. *See, e.g.*, *Goldin v. Pub. Utilities Comm'n*, 592 P.2d 289, 304 (Cal. 1979). They've applied to internet service providers. *See, e.g.*, Cal. Civ. Code §3101 *et seq.*; *ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022) (detailing the history of net-neutrality rules). And they've applied to social media and other websites. *See, e.g.*, *NetChoice*, 49 F.4th at 473-80, 493-94 (social media like Twitter, Facebook, YouTube); *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336 (Ct. App. 2018) (dating application); *White v. Square, Inc.*, 446 P.3d 276 (Cal. 2019) (finance website and application); *cf. State v. Google LLC*, No. 21-CV-H-06-0274, 2022 WL 1818648 (Ohio Com. Pl. May 24, 2022) (Google's search



engine). Email is not "the point where the underlying technology is … so complicated that the government may no longer regulate it to prevent invidious discrimination." *NetChoice*, 49 F.4th at 479.

10.     The court should thus make clear that California's nondiscrimination provisions apply to Google's Gmail. Whether Google is categorized as a common carrier, public accommodation, or a business providing a service, California law prohibits Google's spam filtration of RNC emails based on political affiliation and views. To conclude otherwise would mean that "email providers, mobile phone companies, and banks could cancel the accounts of anyone who sends an email, makes a phone call, or spends money in support of a disfavored political party, candidate, or business." *Id.* at 445.

11.     It is no answer to say, as Google surely will, that its spam filtering is not intentional. The most reasonable inference is that it is intentional. Regardless, Google's conduct is at the very least negligent and unreasonable. And California law forbids that too. Common carrier law doesn't require intentional discrimination. Neither do common law claims like negligent interference with prospective relations. Neither does California's unfair practices law. In the end, Google has violated the law, cost the RNC numerous donations and substantial revenue, and irreparably injured the RNC's relationship with its community.

12.     The RNC therefore seeks an order of this court declaring unlawful and enjoining Google's diversion of the RNC's communications to its supporters that use Google's Gmail service, and ordering all other appropriate remedies authorized by law, including compensatory, statutory, and punitive damages and attorneys' fees.

## PARTIES

13.     Plaintiff RNC is the national committee of the Republican Party as defined by 52 U.S.C. §30101(14). The RNC is incorporated in Washington D.C. and has its principal place of business there. The RNC manages the business of the Republican Party throughout the United States at the national level, including by: developing and promoting the party's national platform; supporting Republican candidates for public office at all levels of government; developing and implementing electoral strategies; educating, assisting, and mobilizing voters; raising funds to support the party's operations and candidates; and recognizing and coordinating with the various territorial and state-

level party organizations and their officers who serve as RNC members. From January 1, 2021, through September 30, 2022, the RNC has raised approximately $296 million. The RNC uses the funds provided by its supporters to engage in interstate commerce by purchasing services in numerous states to fulfill its mission. The RNC's total disbursements in the same period were approximately $349 million.

14.     Defendant Google is a Delaware corporation, whose principal place of business is at 1600 Amphitheatre Parkway, Mountain View, County of Santa Clara, State of California. As the leading internet search engine provider, Google conducts business in all 50 States. Google also provides a variety of other internet-based products, including Gmail, the leading email service provider used by 41.9% of Americans.[1]

15.     Google profits significantly from Gmail through advertising, among other things. *See* https://about.google/intl/en_US/how-our-business-works/ ("Because of advertising, we're able to offer our products to users around the world free of charge...."); *cf. NetChoice*, 49 F.4th at 476 ("[T]he Platforms, which earn almost all their revenue through advertising, are among the world's most valuable corporations."). As a general matter, Google does not charge a user monetary fees to use Gmail. Any person can get a Gmail account if they meet the age requirement to create a Google Account and agree to Google's terms of services.[2]

16.     In return for its service, Google collects key information from the user. In other words, a user's personal information is the compensation for Google's Gmail services. Google then uses that data or sells it to third parties to use. Google also sells to third parties the ability to post or send a targeted, personalized advertisement in the user's inbox. One example is called a "banner ad." Through a service called "Google Ads," Google sells to third parties the ability to post a banner ad in a user's inbox (among other places), and thus, Google profits in part on the popularity of Gmail. *See*

---

[1] Nestor Gilbert, *Number of Active Gmail Users 2022/2023: Statistics, Demographics, & Usage*, FinancesOnline (updated Jan. 14, 2022) https://financesonline.com/number-of-active-gmail-users/.

[2] *See* https://policies.google.com/terms?hl=en-US ("If you meet these age requirements[,] you can create a Google Account for your convenience. Some services require that you have a Google Account in order to work—for example, to use Gmail, you need a Google Account so that you have a place to send and receive your email."); *cf. NetChoice*, 49 F.4th at 474 (Platforms like Google have "represented a willingness to carry anyone on the same terms and conditions," i.e., without individualized bargaining.).



Verified Complaint                                                                                          Case No.

https://ads.google.com/home/campaigns/display-ads/ ("Display ads can help you promote your business when people are browsing online, watching YouTube videos, *checking Gmail*, or using mobile devices and apps. The Google Display Network reaches 90% of Internet users worldwide, across millions of websites, news pages, blogs, and Google sites like *Gmail* and YouTube." (emphases added)). These banner ads generally appear at the top of the "Promotions" and "Social" tabs of a Gmail user's inbox.

## JURISDICTION AND VENUE

17.     This court has subject-matter jurisdiction over this matter under 28 U.S.C. §1331, 28 U.S.C. §1367(a), and 28 U.S.C. §1332(a).

18.     Venue is proper in this district under 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a).

## GENERAL ALLEGATIONS

**I.   Email is an indispensable means of communication for the RNC.**

**A. The RNC uses email to fund campaigns and build a community, especially in California.**

19.     The RNC purchases millions of dollars in goods and services each election cycle to pay for its operations, support the campaigns of numerous Republican candidates nationwide, advocate for laws and policies consistent with its members' interests, and litigate on related issues. To get the funds to fulfill its purpose and pay for these activities, it is essential that the RNC cultivate and maintain relationships with and mobilize its supporters. Many RNC supporters repeatedly fund its efforts through election cycles, necessitating and creating an ongoing financial relationship maintained through communications about the RNC's efforts and needs. The ability of the RNC to reach its supporters through email is indispensable to its basic operations. This is especially true in today's digital world, where landlines and postal mail are rapidly fading in use. And for many RNC supporters, the means of communication through which the RNC can engage with them, and can solicit their support, is Gmail.

20.     This is true in California, specifically. California has the most registered Republicans. And in California, the RNC has eight offices and three community outreach centers: Half of the RNC's offices and a third of its community centers are in the Eastern District of California. Like in



other states, the RNC has sent numerous emails to Gmail users in California who agreed to receive them. Like in other states, the RNC's emails have been sent to spam. California has ranked first in donations and money raised in 2022.

21.    Since February 2022, the RNC has held approximately 349 events in the Eastern District of California. These events are critical to the RNC's efforts to raise funds, engage voters, and support campaigns. The RNC relies on email to inform its supporters of these events. When the RNC sends emails regarding these events, it expects that those emails will reach their recipients' inboxes. But Google at critical moments has sent those emails to the recipients' spam folders, hindering the RNC's communication with those supporters. Google's actions have impeded RNC's efforts to raise funds, engage voters, and support campaigns in the Eastern District of California, resulting in severe economic and reputational damage to the RNC.

**B. The RNC ensures that it sends emails only to those that request them and monitors whether the emails reach a recipient's inbox rather than the spam folder.**

22.    The RNC maintains a list of people who have requested to receive emails from the RNC. The emails the RNC sends via its campaigns.rnchq.com email domain are only sent to people on this list and thus everyone who receives an email from the RNC asked to receive the email. The RNC actively updates the list, so that anyone who no longer wants to receive emails (or a certain type of email) will no longer do so. If the RNC receives a request to no longer receive a particular type of email, it removes the person from receiving the type of emails they unsubscribed from in a reasonable amount of time. If the RNC receives a request to no longer receive any emails, then the person is removed from the email list and, within a reasonable amount of time, will no longer receive any emails. Thus, the emails sent to spam at issue here are solicited—the Gmail user asked the RNC to send him or her emails.

23.    How often a sender's emails reach a user's inbox is called the "inboxing rate." The "inboxing rate" is a critical metric to diagnose and fix issues that cause emails to go to spam. And the RNC strives to keep its inboxing rate high.

24.    Google does not provide data on whether an email reaches a Gmail user's inbox. So, to optimize email deliverability, the RNC contracts with a leading company in the field called Validity

Verified Complaint                                                                    Case No.

to use its email-deliverability platform Everest. According to Validity, "Everest is the absolute pinnacle of email marketing" and is one of the few programs "that gives you full control of all critical stages of email marketing." Together, the RNC can essentially monitor whether its emails reach a user's inbox or is filtered into spam using an industry accepted method. At a general, simplified level, the RNC, with Everest, has created numerous email addresses used specifically to determine whether an email sent by the RNC reaches an inbox or is sent to spam. When the RNC sends an email, it generally sends the email to (1) a subset of its self-created email addresses and (2) a subset of people on its email list. Because the RNC has control over its self-created addresses, the RNC can collect data on an email's performance. With the help of Everest, a statistical analysis is performed to assess to estimate the inboxing rate of the email the RNC sent.

25.     Thus, if Everest and the RNC calculate an inboxing rate of nearly 0%, it means that Gmail hid nearly every campaign email sent by the RNC during the relevant period of time.

26.     Here is an example of an RNC email sent to Californians who requested emails and that Google sent almost completely to spam:



Verified Complaint                                                                    Case No.

**II.  Google has unreasonably sent RNC emails to the spam folder during critical moments in election fundraising and community building.**

27.    Google has repeatedly sent RNC emails to spam contrary to the spam folder's purpose. As a service to its users, and to increase its own profits, Google intercepts certain messages intended for its users that comprise unsolicited and unwanted bulk-emailed messages and place them in a separate folder, called the spam folder. But the spam folder's purpose is to conceal from users unrequested and unwanted messages from unknown senders. This obviously does not apply to the RNC's emails to its supporters, who have requested to receive the emails. Yet Google sends these emails to spam anyway.

28.    And Google's most egregious discrimination began in at least February 2022. That month, when the RNC began working on matters related to the 2022 mid-term election, the RNC detected that its Gmail "inboxing" rate suddenly dropped from rates consistently above 90% to nearly 0% on certain days during the last week of each month. This inboxing rate of nearly 0% means that Gmail hid nearly every campaign email sent by the RNC from the Gmail users on whom the RNC financially relies. Significantly, Google's most egregious spam filtering has repeatedly occurred towards the end of the month—the most effective and important period for these transactions between the RNC and its supporters.

29.    This has reoccurred every subsequent month of 2022. Google has provided a series of false explanations for its spam filtering.

///
///
///
///
///
///
///
///
///

10

Verified Complaint

Case No.



30.     For nearly a year, the RNC has engaged with Google, urging it to stop its interference with the RNC's relationship with its financial supporters. In that time, the RNC has refuted each one of the serial excuses Google has offered for why it persists in blocking the RNC's emails to its supporters, to this day. Google has now fallen silent, no longer deigning to justify its actions in the months prior to the pivotal 2022 election.

31.     Upon noticing that Google was diverting nearly all of its emails to users' spam folders in December 2021, the RNC contacted Google to discuss the issue. Google responded by suggesting that the RNC reduce the frequency of emails that it sends at the end of each month. The RNC and Google also agreed to stay in regular communication to address the issue.

32.     From January 28, 2022, to January 30, 2022, the RNC again noticed a sharp decline in its Gmail inboxing rate. It again contacted Google, which did not provide any additional advice.

33.     On February 14, the RNC conducted an internal test called the "A/B test." For this test, the RNC created two versions of an email whose contents were identical—except that Version *A* and Version *B* had links to different variants of an RNC donation page. The RNC then selected two groups of different individuals—Group *X* and Group *Y*—to send the emails to; there was no overlap between the groups. The RNC sent Version *A* to Group *X* and sent Version *B* to Group *Y*. Even though no



1   recipient received two emails, Version *A* inboxed at the normal rate, while Version *B* inboxed at a rate

2   of approximately 0% (*i.e.,* Version *B* went entirely to spam, while Version *A* didn't). The RNC

3   replicated the test using a new email send, with an identical Version *A* and Version *B* that again only

4   differed in the variant of the donation pages they linked to. These emails again were sent to two groups

5   that did not overlap. The RNC observed the same result: An entire batch of one version of the email

6   went to spam, while the other did not. This test suggests that Google is not suppressing RNC emails

7   based on their communicative content.

8      34. Indeed, the RNC immediately informed Google of the results of its February 14 test.

9   Although Google initially told the RNC that it would check with its product team and provide an

10   explanation as soon as it could, Google did not respond for the remainder of the month. To this day,

11   Google has never responded to the RNC's findings.

12      35. From February 1 to 2, and on February 21, Gmail diverted the RNC's emails to spam

13   folders, causing its inboxing rate to fall to approximately 0%.

14      36. Finally, Google responded that the monthly crashing of the RNC's inboxing rate was

15   due to a high number of user complaints. It also sent the RNC a list of best practices to avoid having

16   emails labeled as spam, such as monitoring their "Postmaster's Tools" (an application that allows for

17   email senders to view their 'reputation' with a given email provider) or checking their Email Service

18   Provider ("ESP") for any irregularities. But Google's explanation was not true. As the RNC informed

19   Google, it already had been actively monitoring its Postmaster Tools, and those tools showed that there

20   were no reputational issues. The RNC also had been told by its ESP, Salesforce, that there were no

21   irregularities causing the issue. There was also no increase in user complaints preceding periods when

22   its inboxing rate fell to nearly 0%. From March 25 to 26, the RNC's inboxing rate again fell to

23   approximately 0%.

24      37. On March 25, the RNC again contacted Google to notify them that the issue was

25   reoccurring even though the RNC still had a "HIGH" reputation in Postmaster. The RNC also reminded

26   Google that the RNC previously submitted information to Google, such as the email address from

27   which its emails were sent, the displayed name of the sender, the subject line, and preview text using a

28   Google form designed to collect this information to avoid mislabeling a sender's email as spam.



Verified Complaint                            Case No.

38.     Eventually, Google agreed to meet again with the RNC to discuss these issues.

39.     To provide context ahead of the meeting, the RNC sent Google an email that documented the RNC's recent efforts to adopt Google's suggestions:

> For your awareness, we had more significant inboxing issues pop up after I emailed on Friday and throughout the weekend.... Volume was almost identical across all days and there was no change in our sending strategy. We have also not seen any rise in spam reports in ReturnPath [now called Everest] and our domains all look healthy. We've noticed that these issues tend to arise most frequently on weekends that include key events for our fundraising and voter contact.... Multiple emails sent over the weekend were expected to be top-performers but all hit spam. We are also going from 100% inboxing to 0% inboxing; there is not much in-between.

40.     On March 29, the RNC met with Google as planned. Google did not present the RNC with any new actionable suggestions, but Google offered to have weekly calls with the RNC to discuss the issue. The RNC accepted this offer and met with Google representatives twice. Then, Google's representative informed the RNC that she could not meet with the RNC because she had been informed that she was not legally permitted to do so.

41.     The RNC once again experienced inboxing problems through April and May. On April 25 to 27, and again on May 27 to 28, the RNC's emails to its supporters who use Gmail were predictably throttled. The RNC continued to contact Google employees and submit reports to Google, but the RNC received no answers and no solutions in return.

42.     On June 14, Google blamed the RNC's press releases as the reason it was diverting the RNC's emails at the end of each month to Gmail users' spam folders. Again, Google's explanation was erroneous. After all, the RNC's press releases are issued from an entirely different email domain (email address) and by comparison were just 0.3% of the email volume as the RNC's main marketing domain.

43.     Two weeks later, on June 28, the RNC's inboxing rate for Gmail users again dropped to 0%.

///
///
///
///



13

44.     The next day, on June 29, Google provided two new suggestions for its discriminatory spam filtering: (1) that the RNC's domain authentication (a system ensuring an email comes from the purported sender) was possibly at fault; and (2) that the issue could be a result of Google's algorithmic spamming system, which collects spam reports over the course of the month and eventually causes a sender's email to be diverted to Gmail users' spam folders. But again, this was no comfort to the RNC. As the RNC notified Google, Salesforce had already confirmed that its authenticator was functioning properly, and the algorithmic spamming explanation was contradicted by data showing that RNC emails only received spam complaints at 0.01%, the lowest rate the RNC had observed since it began tracking the statistic.



45.     On July 29, the RNC's inboxing rate fell to nearly 0%.

46.     On August 11, Google came to the RNC to give a training on "Email Best Practices" to the RNC's digital department.

47.     Despite the RNC following Google's best practices, the filtering reoccurred. On August 29, the RNC's inboxing rate fell to nearly 0%.

48.     As the 2022 midterm elections continued to draw closer, so too did the urgency with which the RNC needed to address its ongoing issues with Gmail inboxing. On September 29, over nine months after it first contacted Google to seek a solution, the RNC sent Google an email stating:

> We're 40 days out from Election Day, **we do not have any new transparency from Google**, and we need a resolution. Can Google mitigate this spamming immediately." After detailing how the RNC had adopted Google's suggestions to date, the RNC noted that "despite having a significantly positive impact on [email] performance, this appears to have had absolutely no impact on the timing of this ridiculous spamming.



Verified Complaint                                                                      Case No.

49.     The next day, September 30, Google responded that it would be in touch.

50.     But it hasn't. For the last three weeks, the RNC has heard nothing from Google.

51.     From September 29 to October 2, the RNC's inboxing rate fell to nearly 0%.

52.     In sum, Google has repeatedly intercepted and diverted the RNC's essential communications to the financial supporters on which it relies and has done so in the most critical period in the election cycle. Specifically, Google diverted and concealed as "spam" nearly all of the RNC emails to Gmail users during the following periods: February 2 to 3, and 21; April 25 to 27; May 27 to 28; June 28; July 29; August 29; and September 28 through October 2.

53.     The RNC also tracks its inboxing rate for other popular email platforms, such as Yahoo! Mail and Microsoft's Outlook Mail. Although those platforms have an identical interest to Google in limiting "spam" to their users, they did not conceal all (or nearly all) of the RNC's emails from its supporters at any point. Indeed, the inboxing rates on these platforms did not reflect *any* dramatic decrease in inboxing rates, let alone the inboxing rate of nearly 0%, that Google imposed on the RNC's emails at the close of every month in 2022.





Verified Complaint                                                                                        Case No.

54.     Moreover, a recent study by researchers at North Carolina State University ("N.C. State Study") found that Google's Gmail labels *significantly* more campaign emails from Republican political candidates as spam than campaign emails from Democratic political candidates. Specifically, the study found that Gmail labeled only 8.2% of Democratic campaign emails as spam, compared with 67.6% of Republican campaign emails. This amounts to Gmail labeling Republican campaign emails as spam at more than eight times (8x) the rate of Democratic emails.[3]

55.     Google is also aware of, and has responded to, a public study establishing that it is intercepting Republican organizations' emails at eight times (8x) the rate of similarly situated Democrat party groups.[4] And in response to the RNC's repeated requests for an explanation and to cease its interference, Google has offered only a serial litany of false reasons before going silent.

56.     Accordingly, the available evidence establishes that Google's interception and diversion of the RNC's emails, and the harm it is causing to the RNC, is intentional, deliberate, and in bad faith.

### III.   The RNC is suffering ongoing and permanent harm by Google's intentional (or negligent) spam filtering.

57.     With the midterm elections only weeks away as of the filing of this complaint, it is imperative that Google immediately ceases its practice of intentionally (or negligently) mislabeling RNC emails as spam. Google's conduct has hindered the RNC's ability to communicate with its constituents on important issues and impeded its community from learning about vital information on community outreach, getting out to vote, and the election and of taking advantage of those opportunities.

58.     As a direct and proximate result of Googles' conduct, the RNC has and continues to suffer cognizable damages amounting well over $75,000.00. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term

---

[3] Iqbal, et al., *A Peek into the Political Biases in Email Spam Filtering Algorithms During the US Election 2020 (Pre-Print Version), Association for Computing Machinery: World Wide Web Conference*, (Mar. 31, 2022).
https://arxiv.org/pdf/2203.16743.pdf; for full version, see https://dl.acm.org/doi/10.1145/3485447.3512121.

[4] *See supra*, at n.2; https://mashable.com/article/republican-gmail-spam.



16

consequential losses likely total in the millions of dollars. This loss of funding has caused the permanent loss of opportunities for the RNC that those funds could have supported, in addition to harming its relationships with its supporters at a time when they are particularly attuned to politics and expect the RNC to be communicating with them.

**COUNT I**
**VIOLATION OF CALIFORNIA COMMON CARRIER LAW**
**Cal. Civ. Code §2168 *et seq.***

59.     Plaintiff realleges all allegations made in paragraphs 1 through 58.

60.     Under Cal. Civ. Code §2168, Google is a common carrier because it "offers to the public to carry … messages" through its Gmail service.

61.     As a common carrier, Google must as far as it is able "accept and carry" any email messages offered to it at a reasonable time and place. Cal. Civ. Code. §2169.

62.     As a common carrier, Google is obligated to deliver messages without preference in time, price, or otherwise, in the order they are received. Cal. Civ. Code §§2170 and 2208.

63.     Google violated Cal. Civ. Code §2169 by refusing to accept and carry email messages from the RNC to Gmail users' inboxes in the final days of each month.

64.     Google violated Cal. Civ. Code §§2170 and 2208 by failing to deliver the RNC's messages to users' inboxes at the end of each month because they were being sent by the RNC.

65.     Repeatedly, Google has unreasonably delayed or refused to carry the RNC's messages to Gmail users' inboxes during substantial periods at the end of each month and continues to do so.

66.     The RNC has suffered damages, because its members who opted to receive communications via email service were prevented from participating in the RNC's fundraising campaigns and other events. On information and belief, this likely resulted in well over $75,000 in lost donations and has caused irreparable injury to the RNC's reputation, goodwill, recruitment efforts, community outreach, and control over its communications. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total in the millions of dollars.

67.     Under Cal. Civ. Code §2209, the RNC is entitled to recover from Google its actual damages, plus $50, for the refusal and postponement of its messages.



Verified Complaint                                                                                          Case No.

## COUNT II
## UNRUH CIVIL RIGHTS ACT
### Cal. Civ. Code §51 *et seq.*

68.     Plaintiff realleges all allegations made in paragraphs 1 through 67.

69.     The Unruh Civil Rights Act guarantees that all persons are entitled to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." *See* Cal. Civ. Code §51. Any exclusionary policy that is based on "political affiliation," "member[ship]" in a political organization, or "personal beliefs" is arbitrary discrimination proscribed by Unruh. *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721, 726 (Cal. 1982) ("political affiliation"); *In re Cox*, 474 P.2d 992, 1000 (Cal. 1970) ("member[ship]"); *Harris v. Cap. Growth Invs. XIV*, 805 P.2d 873, 883 (Cal. 1991) ("personal beliefs").

70.     Google intentionally (or willfully) denied the RNC full and equal access to Gmail during critical end-of-month fundraising windows, when it refused to carry RNC emails to its users' inboxes.

71.     Google has violated the Unruh Act by denying, or aiding or inciting the denial of, the RNC's right to full and equal use of the advantages, facilities, privileges, or services Google offers to the public.

72.     This exclusionary policy was based on the political affiliation of the RNC, to which Google is antagonistic.

73.     Google has intentionally discriminated against the RNC because of its political affiliation.

74.     Plaintiff prays for judgment under Cal. Civ. Code §52, including issuance of an injunction, actual damages, statutory damages of at least $4,000 "for each and every offense," and attorney's fees.

## COUNT III
## UNFAIR COMPETITION LAW
### Cal. Bus. & Pro. Code §17200, *et seq.*

75.     Plaintiff realleges all allegations made in paragraphs 1 through 74.

76.     California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited

Verified Complaint                                                                                    Case No.

by [California's False Advertising Law]." Cal. Bus. & Prof. Code §17200. Google's acts and practices violate this statute because they are unlawful, unfair, and fraudulent.

77.    First, Google's conduct is unlawful because its business acts and practices violate other laws, including California's common carrier laws, the Unruh Act, the Federal Communications Act, and common law prohibitions against negligence and interference with prospective economic relations.

78.    Second, and independently, Google's conduct is unfair. *See In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (A business practice may be unfair without being "proscribed by some other law." (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003))); *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021). That is because Google presents Gmail as an email service provider that delivers emails in a fair and good faith manner in exchange for the user's information, which Google uses or sells to third parties. And yet, Google is surreptitiously preventing the RNC's messages from reaching its supporters' Gmail inboxes, even though the supporters requested the RNC's emails. Google's business practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020) (quoting *Morgan v. AT&T Wireless Servs., Inc.*, 99 Cal. Rptr. 3d 768, 784 (Ct. App. 2009)). The harm caused by Google's business practices to the RNC, its community, and the public far outweighs any "reasons, justifications [or] motives" Google could have for its conduct. *Id.*

79.    Third, and also independently, Google's conduct is fraudulent because its users relied on Google as an email service that would allow them to send and receive emails, not knowing that Google would engage in partisan or arbitrary manipulation to prevent certain emails from reaching their inbox. Google's users could have elected to use a different email service if they knew that Google would effectively censor the RNC.

80.    Google's actions in violation of Cal. Bus. & Prof. Code §17200 prevented its users from participating in the RNC's fundraising campaigns resulting in lost revenue to RNC. On information and belief, these immediately lost donations total well over $75,000. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total in the millions of dollars. The RNC has suffered and



19

will continue to suffer irreparable injury to its reputation, goodwill, recruitment efforts, community outreach, and control over its communications.

81.     Plaintiff prays that Google's conduct be enjoined by this court under Cal. Bus. & Prof. Code §17203.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

82.     Plaintiff realleges the allegations made in Paragraphs 1 through 81.

83.     To state a claim for intentional interference with prospective economic relations, a plaintiff must show: "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 803 (Cal. 2017).

84.     Under California law, the defendant's intentionally wrongful acts designed to disrupt the relationship need not be directed towards the plaintiff but may be "independently tortious *only as to a third party*." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 956 (Cal. 2003) (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 761 (Cal. 1995)).

85.     Here, the RNC has existing economic relationships with its financial supporters, which entail a high probability of future economic benefit to the RNC in the form of repeat donations.

86.     As alleged above, Defendant Google has actual knowledge of the RNC's existing economic relationships with its financial supporters. The RNC has repeatedly informed Defendant of the economic value of these relationships and that Defendant's wrongful acts are causing significant harm to the relationships and resulting financial harm to the RNC.

87.     Defendant Google has offered the RNC a series of varying "explanations" as to how the RNC might prevent Google from intercepting the RNC's emails and diverting them to Gmail users' spam folders. The RNC has obligingly altered its practices to address every one of Google's proffered explanations. Still, despite the RNC's diligent and targeted efforts following Defendant's directions, Google has continued to intercept and divert to its users' spam folders nearly all of the RNC's emails

1    in the final days every month. The complete absence of reasonable alternative explanations as to why

2    Google is intercepting and diverting RNC emails indicates that Defendant is engaging in intentionally

3    wrongful acts designed to disrupt the existing economic relationship between the RNC and its donors.

4          88.    As a direct and proximate result of Defendant Google's intentional wrongful acts as

5    described herein, there has been an actual disruption of the RNC's existing economic relationship with

6    supporters who are past, current, and future donors. Google has been repeatedly intercepting and

7    diverting the RNC's communications with its financial supporters, in fact causing a measurable

8    decrease in their donations to the RNC.

9          89.    Accordingly, the facts as alleged above establish that Defendant Google is liable to

10   Plaintiff for intentional interference with a prospective economic relationship.  On information and

11   belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to

12   date, and the long-term consequential losses likely total in the millions of dollars.

13         90.    The RNC prays for damages according to proof at trial under this claim, pursuant to Cal.

14   Civ. Code § 3333, and other applicable California laws, and for injunctive relief pursuant to Cal. Civ.

15   Code §525 *et seq.*

16                          **COUNT V**
     **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

17         91.    Plaintiff realleges the allegations made in Paragraphs 1 through 90.

18         92.    California law recognizes the tort of negligent interference with prospective economic

19   relations. *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979).

20         93.    A claim for negligent interference with prospective economic relations requires that the

21   plaintiff establish: "(1) an economic relationship existed between the plaintiff and a third party which

22   contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant

23   knew of the existence of the relationship and was aware or should have been aware that if it did not act

24   with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in

25   part the probable future economic benefit or advantage of the relationship; (3) the defendant was

26   negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually

27   interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage

28   reasonably expected from the relationship." *N. Am. Chem. Co. v. Superior Ct.*, 69 Cal. Rptr. 2d 466,

479 (Cal. App. 1997).

94.     To establish negligence, "the plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Brown v. USA Taekwondo*, 483 P.3d 159, 164 (Cal. 2021) (internal quotation marks omitted).

95.     In the context of a claim for negligent interference with prospective economic relations, California courts assess whether the defendant owed the plaintiff a duty by applying the six factors outlined in *Biakanja v. Irving*, 49 320 P.2d 16 (Cal. 1958). *See J'Aire*, 598 P.2d at 63. These factors include: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm." *Id.*

96.     As stated above, the RNC is in existing economic relationships with supporters who are past, current, and future donors that subscribe to receive RNC emails, establishing a high probability of future economic benefit to the RNC in the form of repeat political donations.

97.     As also stated above, Google knew of these existing economic relationships, as the RNC directly informed Defendant about them.

98.     Further, Google owed the RNC a duty to not falsely or arbitrarily label the RNC's emails to its supporters as spam for several reasons: (1) Defendant Google's interception and diversion of the RNC's emails with Gmail users is necessarily a transaction intended to affect the RNC; (2) it is highly foreseeable that by engaging in such conduct, Defendant would cause harm to the RNC and in fact the RNC informed Google it was harming the RNC; (3) Defendant knew with a high degree of certainty that intercepting and diverting RNC emails to its supporters would harm to the RNC, if for no other reason than the RNC told Google that it harmed the RNC, and continues to do so; (4) Defendant's conduct is directly connected to the injury suffered by the RNC, namely, the loss of funds from RNC supporters because Defendant prevented them from receiving crucial RNC emails; (5) Defendant's interception and diversion of the RNC's emails is morally blameworthy because it baselessly and secretly suppresses the political speech and income of one major political party and Google has concealed its true purpose with months of false explanations; and (6) public policy strongly supports

22



1    the prevention of Google's arbitrary and self-serving interference in the economic relationships of its

2    users and groups like the RNC with which it is apparently antagonistic due to Google's dominance of

3    the email market, the national interest in protecting freedom of political expression and association, the

4    need for Americans to stay informed and provide financial support for candidates of their preferred

5    political ideology, and the freedom of the American people to engage in the electoral process with and

6    through political organizations free from corporate manipulation.

7        99.    Defendant Google thus breached its duty to the RNC by intercepting and diverting to

8    spam folders nearly all RNC emails to its supporters at the end of each month.

9        100.    By breaching its duty, Defendant Google proximately caused substantial financial harm

10   to the RNC in the form of cognizable lost donations. On information and belief, Google has caused

11   hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term

12   consequential losses likely total in the millions of dollars.

13       101.    The RNC prays for damages according to proof at trial under this claim, pursuant to Cal.

14   Civ. Code §3333, and other applicable California laws, and for injunctive relief pursuant to Cal. Civ.

15   Code §525 *et seq.*

16                          **COUNT VI**
                     **UNLAWFUL DISCRIMINATION**
17                        **47 U.S.C. §202**

18       102.    Plaintiff realleges all allegations made in paragraphs 1 through 101.

19       103.    The Telecommunications Act defines "common carrier" as "any person engaged as a

20   common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign

21   radio transmission of energy, except where reference is made to common carriers not subject to this

22   chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be

23   deemed a common carrier." 47 U.S.C. §153(11).

24       104.    The Act subjects certain common carriers to various nondiscrimination obligations.

25   *See, e.g.*, 47 U.S.C. §201(b).

26       105.    Governing precedent requires courts to defer to the Federal Communications

27   Commission's reasonable classification of services. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 752

28   (9th Cir. 2000); *see also Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (explaining that lower



23

1  courts are still bound by *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967

2  (2005)); *ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022).

3        106.   The FCC does not classify email providers as common carriers subject to

4  nondiscrimination obligations. The D.C. Circuit has upheld the classification as reasonable. *See*

5  *Mozilla*, 940 F.3d at 18. The Ninth Circuit has adopted, if not strongly suggested, agreement with the

6  D.C. Circuit's conclusions. *See ACA Connects*, 24 F.4th at 1241 ("We are guided by the D.C. Circuit's

7  decision in Mozilla as to the scope of the FCC's regulatory and preemptive authority after the 2018

8  reclassification.").

9        107.   The RNC brings this claim under 47 U.S.C. §§206 and 207. The RNC also

10 acknowledges that this claim is foreclosed by binding precedent and is alleging it to preserve the issue

11 for further review or intervening Supreme Court precedent.

### COUNT VII
### NEGLIGENCE
### Cal. Civ. Code §2162

14       108.   Plaintiff realleges the allegations made in paragraphs 1 through 107.

15       109.   Google has a duty to the public to receive, to the extent of their capacity, all messages

16 clearly and intelligibly written, and to transmit them upon reasonable terms. *C.f. Primrose v. Western*

17 *Union Tel. Co.* 154 U.S. 1, 14 (1894) (holding that telegraph companies bore this same duty). In

18 California, a carrier of messages for reward also has a statutory duty to "use great care and diligence in

19 the transmission and delivery of messages." Cal. Civ. Code §2162.

20       110.   Google thus has a duty to receive emails sent by the RNC, and to transmit them to

21 Gmail users' inboxes upon reasonable terms.

22       111.   Google also has a duty to transmit and deliver messages sent by the RNC to Gmail

23 users with great care and diligence.

24       112.   Google did not transmit the RNC's emails to its users' inboxes on reasonable terms,

25 or exercise care and diligence in the transmission and delivery of the RNC's emails to Gmail users

26 because it has in bad faith, and for no accurate or reasonable reason it can explain, intercepted and

27 diverted the RNC's emails to Gmail users' spam folders. Google's political bias or hostility to the RNC

Verified Complaint        Case No.

1  is not a reasonable basis for refusing to transmit the emails to its users' inbox and, in the alternative, its

2  arbitrary or incompetent failure to deliver the RNC's emails to Gmail users' inboxes does not constitute

3  great care and diligence.

4      113.    As a result of Google's breach of its duties, the RNC was unable to communicate with

5  its financial supporters who were Gmail users during the most critical periods of fundraising. This

6  prevented RNC financial supporters from learning about the RNC's efforts and opportunities to support

7  those efforts, and the RNC was harmed by not receiving donations it would have otherwise received.

8  On information and belief, these immediately lost donations likely amount to hundreds of thousands of

9  dollars, if not more, and the long-term consequential losses likely total in the millions of dollars.

10     114.    The RNC prays for damages according to proof at trial under this claim, pursuant to

11  Cal. Civ. Code § 3333, and other applicable California laws, and for injunctive relief pursuant to Cal.

12  Civ. Code §525 *et seq.*

13

14      WHEREFORE, Plaintiff requests that judgment be entered against Defendant, ordering:

15          (a)  a decision that the policies and practices complained of are unlawful under

16              state and federal law;

17          (b)  preliminary and permanent injunctive relief to remedy Google's violations of state

18              and federal law;

19          (c)  an award of actual, statutory, and exemplary damages to be paid by Google;

20          (d)  an award of reasonable attorneys' fees and costs incurred in filing this action

21              under Cal. Civ. Code §52 and other applicable laws;

22          (e)  an award of pre- and post-judgment interest; and

23          (f)  such further relief as the court deems appropriate.

24  ///

25  ///

26  ///

27  ///

28  ///



Verified Complaint                                                                      Case No.

Date: October 21, 2022                  **DHILLON LAW GROUP INC.**

                                        By: /s/ Harmeet K. Dhillon
                                            Harmeet K. Dhillon
                                            Michael A. Columbo (admission forthcoming)
                                            Jeremiah D. Graham
                                            Anthony J. Fusaro, Jr. (admission forthcoming)
                                            DHILLON LAW GROUP INC.
                                            177 Post Street, Suite 700
                                            San Francisco, California 94108
                                            Telephone: (415) 433-1700
                                            *Counsel of Record for Plaintiff Republican National Committee*

                                        **CONSOVOY MCCARTHY PLLC**

                                            Thomas R. McCarthy (pro hac vice forthcoming)
                                            Thomas S. Vaseliou (pro hac vice forthcoming)
                                            Conor D. Woodfin (pro hac vice forthcoming)
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Suite 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            *Counsel for Plaintiff Republican National Committee*

<u>**JURY DEMAND ON FOLLOWING PAGE**</u>



26

Verified Complaint                                                          Case No.

1

2

3

4

5                              **DEMAND FOR JURY TRIAL**

6          Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all

7    claims in this action of all issues so triable.

8

9    Date: October 21, 2022               **DHILLON LAW GROUP INC.**

10                                  By: /s/ Harmeet K. Dhillon
11                                      Harmeet K. Dhillon
                                        Michael A. Columbo (admission forthcoming)
12                                      Jeremiah D. Graham
                                        Anthony J. Fusaro, Jr. (admission forthcoming)
13                                      DHILLON LAW GROUP INC.
                                        177 Post Street, Suite 700
14                                      San Francisco, California 94108
                                        Telephone: (415) 433-1700
15                                      *Counsel for the Republican National Committee*

16
                                    **CONSOVOY MCCARTHY PLLC**
17
                                        Thomas R. McCarthy (pro hac vice forthcoming)
18                                      Thomas S. Vaseliou (pro hac vice forthcoming)
                                        Conor D. Woodfin (pro hac vice forthcoming)
19                                      CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Suite 700
20                                      Arlington, VA 22209
                                        (703) 243-9423
21                                      *Counsel for Plaintiff Republican National Committee*

22

23

24                          **VERIFICATION ON FOLLOWING PAGE**

25

26

27

28



Verified Complaint                                                              Case No.

1

# VERIFICATION

2      I, Christian Schaeffer, declare under penalty of perjury under the laws of the United States of

3   America that the foregoing is true and correct. 28 U.S.C. §1746.

4   Date: October 21, 2022

5

6      Christian Schaeffer, on behalf of the
       REPUBLICAN NATIONAL COMMITTEE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                                                    Case No.